WESTERN BANCSHARES, INC., a corporation, Petitioner-Appellant,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent-Appellee.

No. 72–1661.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 23, 1973.

Decided June 21, 1973.

Robert B. Berkley, Salina, Kan. (Thomas J. Kennedy, Salina, Kan., on the brief), for petitioner-appellant.

Stephen F. Eilperin, Dept. of Justice, Washington, D.C. (Harlington Wood, Jr., Asst. Atty. Gen., and Walter H. Fleischer, Dept. of Justice, Washington, D.C., on the brief), for respondent-appellee.

Before BREITENSTEIN, BARRETT, and DOYLE, Circuit Judges.

BARRETT, Circuit Judge.

The question presented in this case is whether the Bank Holding Company Act of 1956, as amended, 12 U.S.C.A. § 1841 et seq., empowers the Federal Reserve Board to deny the subject application of a Kansas bank holding company to retain its controlling interest in an acquired Kansas bank. The Board denied the holding company's application because it failed to seek the Board's prior approval of the bank stock acquisition and because the minority stockholders' interest in the acquired bank had been purchased for approximately two-thirds less than the majority interest without disclosure of the disparity. The Board ordered the holding company to immediately divest its interest in the acquired bank.

12 U.S.C.A. § 1842(a) was amended effective December 31, 1970, requiring prior approval by the Board of a single bank acquisition by a bank holding company. The specific ground for Board denial of the bank acquisition in this case is that it is not in the public interest because of the disparity in the purchase prices, without disclosure to the minority shareholders of this fact, in violation of the Board's policy that substantially equivalent offers must be

made to all stockholders. Following denial of an application for reconsideration, this petition for review was filed. We set aside the Order of the Board of Governors of the Federal Reserve System.

Jack B. Berkley of Stockton, Kansas, heard late in 1970 that Mr. and Mrs. John McCormick, the owners of 77% or 383½ shares of the 500 outstanding shares of Rooks County State Bank of Woodston, Kansas, intended to sell their shares. At that time Jack Berkley was serving as President of Stockton National Bank, located some nine miles from Woodston. He phoned the McCormicks after consulting with his six brothers and one sister about the feasibility of purchasing the controlling shares. The McCormicks advised him that they did not wish to negotiate for the sale until after December 19, 1970. On December 21st, Berkley ascertained that the McCormicks would sell their stock for $521.51 per share. Berkley and his family, including his brother Robert, who was attorney for the group, met and unanimously decided to authorize Jack to purchase the McCormick stock for the group. His brother Robert was directed by the purchasing group to organize a bank holding corporation to be known as Western Bancshares, Inc., which would be the assignee of the McCormick stock. Robert did not accomplish the necessary paper work for qualification of Western until January 8, 1971. In the meantime, Jack B. Berkley had personally contracted with McCormicks, as nominee for Western. He took their shares in his name on December 23, 1970, upon payment of $521.51 per share. Subsequently, Jack Berkley acquired the stock of other officers of Rooks County State Bank, Mr. Northup and Mr. and Mrs. Meyer, for $400.00 per share. That same day, December 23, 1970, Jack notified the remaining stockholders that he and his associates had acquired 83% of the bank's stock. He did not disclose to them that McCormicks had been paid $521.51 per share or that Northup and Meyers had been paid $400.00 per share.

He offered to purchase each of the remaining and outstanding shares at $160.00. By December 29, 1970, Jack Berkley had purchased 414 shares in his name for the group. The Bank Holding Company Act Amendments of 1970, 12 U.S.C.A. § 1841 et seq., became effective December 31, 1970. None of the Berkleys had personal knowledge of this between January 1, 1971 and January 7, 1971, when Jack purchased an additional 31 shares at $160.00 each. Some 6½ shares were acquired at $164.00 each.

On January 8, 1971, Western Bancshares, Inc., was incorporated under the laws of Kansas. Five members of the Berkley family were named as officers and directors. On that same date Jack Berkley assigned the shares of the acquired stock to the holding corporation, together with the requisite shares to the officers and directors necessary for qualification.

No finding was made and the record does not support any contention that the Berkley group at any time acted wilfully to form the bank holding company and to acquire the ownership or control of the voting shares of the Rooks County State Bank in violation of 12 U.S.C.A. § 1842(a).

Effective September 1, 1971, the Federal Reserve Board promulgated certain guidelines for approval of holding company acquisitions which included the mandate that: "(i) *if any offer to acquire the shares is extended to shareholders of the bank, the offer is extended to all stockholders of the same class on an equal basis;*" (Emphasis ours).

The pertinent Bank Holding Company Act factors to be considered by the Board prior to acquisition approval are those contained in 12 U.S.C.A. § 1842(c)(2), the full text of which is:

(c) The Board shall not approve—

(2) any other proposed acquisition or merger or consolidation under this section whose effect in any section of the country may be substantially to lessen competition, or to tend to create

a monopoly, or which in any other manner would be in restraint or [sic] trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the *probable effect of the transaction in meeting the convenience and needs of the community to be served.*

(Emphasis ours).

■■■ Our review of the legislative history relating to the Bank Holding Company Act Amendments of 1970, 12 U.S.C.A. § 1841 et seq., (1970 U.S.Code Cong. & Admin.News, 91st Cong., 2nd Sess., Vol. 3, pp. 5519–5582), does not disclose that Congress intended to regulate the price of acquisition stock by bank holding companies. Rather, the thrust of the 1970 amendments is designed to more adequately protect against abuses which may be of future concern on the part of previously exempt one-bank holding companies in addition to certain modifications relating to companies controlling more than one bank. These possible abuses or future concerns related to monopolistic practices, lessening of competition and extension of a line of credit to finance an unrelated business concern over which it had control. By bringing the one-bank parent holding company within the Act, Congress expressed concern only that the Board be allowed to exercise control relating to the express factors above referred to and management policies of the bank in meeting the public need and convenience.

The Board's divesture order is based entirely on its administrative policy requiring equal treatment to shareholders in bank acquisitions. The Board places great emphasis upon the words "public interest" in 12 U.S.C.A. § 1842(c)(2), *supra.* It contends that this is a broad grant of legislative power authorizing enforcement of its guideline requiring that all stock acquisition offers must be substantially equal. In effect, the Board urges that we isolate from the balance of the language in the section the words "public interest" because its price equality policy is fair, equitable and just. We have no argument with the Board's policy determination; however, neither the Board nor this court may usurp a function vested exclusively in the legislative branch. We are neither swayed nor impressed by the recital in the Board's brief that it has applied the subject guideline in other bank holding company approval cases without apparent contest or that the American Bankers Association has indicated its approval of the substantially equivalent offer requirement. Neither administrative agencies nor courts may legislate.

The Board has been granted neither express nor implied authority to regulate, control, fix, supervise or otherwise interfere with the price or consideration which a bank holding company proposes to pay to shareholders for stock in a bank *unless* the condemnations contained in 12 U.S.C.A. § 1842(c)(2), *supra,* are established in relation to the disparate acquisitions. Such is not the case in the record before us here. While we agree with the appellants' contentions that the acquisition of the controlling interest in the Rooks County State Bank occurred prior to the 1970 Amendments to the Act and that Western Bancshares, Inc. was likely a *de facto* corporation throughout the contract negotiations, we do not deem these matters necessary to the disposition of the case. The Board was without power to order divestiture for lack of statutory authority, express or implied.

The Board argues that its policy requiring that substantially equivalent offers be made to all stockholders represents sound public policy in that: (1) inherent fairness justifies a policy that all shareholders be treated on an equivalent basis; (2) to the extent that minority shareholders were treated less equitably than majority shareholders, capital financing for bank stock would be hindered; and (3) without an opportunity to sell out on a substantially equivalent ba-

sis to majority stockholders, the minority interest in a bank suffered a precarious existence. Thus, it is apparent that the Board's concern has been and is now concentrated on the protection of the interests of the minority stockholders. Nothing in relation to the Board's concern in this regard indicates any lessening of competition, tendency to create a monopoly, restraint of trade, anticompetitive effect, or want in *"meeting the convenience and needs of the community to be served,"* the sole criteria laid down by Congress. 12 U.S.C.A. § 1842(c)(2), *supra.* (Emphasis ours). These are the specific standards prescribed by Congress. The legislative standard is therefore present and declared. Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S. Ct. 241, 79 L.Ed. 446 (1935); United States v. Chicago, Milwaukee, St. Paul and Pacific Railroad Company, 282 U.S. 311, 51 S.Ct. 159, 75 L.Ed. 359 (1931).

The Board, in findings contained in its August 31st Order, recited that as of December 21, 1971, the deposits in the Rooks County State Bank were $1.2 million. The population of Woodston is only 332. As of January 1, 1971, total loans of the bank were barely in excess of $40,000. After the acquisition, and as of June 30, 1972, total loans of the bank were $286,000. The Board did not take note of each of these facts, but it did specially find that "approval of the proposal would have no effect upon either existing or potential competition." The Board's entire case for disallowance was its consideration of the "public interest" aspect of the disparity in the purchase prices paid for acquisition, noting the inequitable treatment accorded to the minority (shareholders) as the *sole* factor leading to its conclusion that the public interest would not be served by approval of the application. The vote of the Board was 4 to 2. The Chairman was absent and not voting. The majority held that the disparity in purchase prices outweighed considerations relating to the financial and managerial resources, future prospects of the Bank

and the needs of the community to be served.

Had Congress intended stock acquisition price offers to be a relevant factor for consideration by the Federal Reserve Board in its deliberations relative to applications for approval of bank holding company acquisitions, it was fully capable and able to so declare. Presumably, everything the Federal Reserve Board and this court does is in the "public interest." The selective process of the Board in relying upon the broad maxim or reference to the "public interest" lends no aid, and in fact blends with confusion in the decisional process here involved. Congress *did not* isolate the terms to fit the Board's fancy. It spelled out the specific factors to be considered by the Board relating thereto. Once Congress determines that a segment of our national industry must be regulated, it is confronted with the dilemma of how to strike a proper balance between private and public control. Columbia Broadcasting System, Inc., v. Democratic National Committee, 412 U. S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973); Farmers Educational & Cooperative Union of America, North Dakota Division v. WDAY, Inc., 360 U.S. 525, 79 S.Ct. 1302, 3 L.Ed.2d 1407 (1959). We are not dealing in the broad spectrum of administrative policy delegated by Congress to an agency determinative of "public interest, convenience, and necessity." Public Utilities Commission of the District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952). Issues as to the reasonableness or inequality of stock purchases must be decided upon the basis of the law of contracts, or such other principles of law as may be applied in a forum competent to adjudicate the issue between the parties thereto. Contemporaneous construction of a statute by an agency charged with its enforcement is entitled to great deference by the courts. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). But we are not bound thereby, and particularly so where

neither the Act nor the legislative history contains one word expressly permitting the administrative authority assumed. National Labor Relations Board v. The Boeing Company, 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973); Scofield v. National Labor Relations Board, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969).

Nothing in this record indicates that a federal interest is involved, or, if incidentally involved (in the price paid for the stock acquisitions), that it dictates authorization by implication of the regulatory order under the Bank Holding Company Act. Congress has not seen fit to speak to the subject matter. The Board, in effect, urges this court to exercise its classical adjudicative power to legislate. When Congress was dealing with the identical statutes here involved, it was capable of clearly and expressly empowering the Board to regulate in the subject areas, i. e., to order that equity be done if inequity were found to exist in stock acquisitions. Congress did not do so. Just as we have declined to imply private rights and civil remedies from federal regulatory statutes absent a compelling federal interest of a governmental nature, we refuse to imply that administrative authority exists empowering the Board to regulate the offering price for bank stock acquired under the Bank Holding Company Act. Chavez v. Freshpict Foods, Inc., 456 F. 2d 890 (10th Cir. 1972); McCord v. Dixie Aviation Corporation, 450 F.2d 1129 (10th Cir. 1971); Rogers v. Ray Gardner Flying Service, Inc., 435 F.2d 1389 (5th Cir. 1970), cert. denied 401 U.S. 1010, 91 S.Ct. 1255, 28 L.Ed.2d 546 (1971).

The Board of Governors of the Federal Reserve System lacked statutory authority to deny the application of the petitioner because substantially equivalent purchase price offers to all of the Rooks County State Bank stockholders had not been made. We need not decide the other points raised on appeal.

The Order of the Board is set aside.