DIAMOND RING RANCH, INC.,
Plaintiff-Appellee,

v.

Rogers C. B. MORTON, Secretary of the Interior, and Daniel P. Baker, State Director of the Bureau of Land Management for the State of Wyoming, Defendants-Appellants.

No. 75–1201.

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 11, 1975.

Decided Feb. 4, 1976.

Rehearing Denied March 22, 1976.

Claude W. Martin, Brown, Drew, Apostolos, Barton & Massey, Casper, Wyo. (William H. Brown, Brown, Drew, Apostolos, Barton & Massey, Casper, Wyo., on the brief), for plaintiff-appellee.

Neil T. Proto, Atty., Dept. of Justice (Wallace H. Johnson, Asst. Atty. Gen., Clarence A. Brimmer, U. S. Atty., Cheyenne, Wyo., and Edmund B. Clark and George R. Hyde, Attys., Dept. of Justice, on the brief), for defendants-appellants.

Victor H. Kramer, Charles E. Hill, Washington, D. C., Daniel G. Clement, Pasadena, Cal., Institute for Public Interest, for amicus curiae National Wildlife Federation.

Before SETH, HOLLOWAY and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

The Secretary herein seeks reversal of the judgment of the district court which voided a sanction imposed by the Secretary and his delegates against the Diamond Ring Ranch following an alleged violation by Diamond Ring Ranch of the terms and conditions of a lease of government land to it under the Taylor Grazing Act, 48 Stat. 1269, 43 U.S.C. Sec. 315 et seq. The violation giving rise to this was the alleged indiscriminate spraying by Diamond Ring of sagebrush on government land which was being used by Diamond Ring pursuant to the Taylor Grazing Act. This occurred without Diamond Ring's obtaining the approval of the Bureau of Land Management. The effect of this spraying was to temporarily at least eradicate the sagebrush so that other

edible forage plants can grow. In a period of eight or ten years, we are told, the sagebrush returns. How much returns is a subject of dispute. The concern of the Bureau of Land Management is, presumably, that the sagebrush, although not edible by livestock, provides the food and habitat needs for wildlife.

The district court entered judgment on December 20, 1974, which included injunctive and declaratory relief favoring the Diamond Ring Ranch Company. The trial court rejected the Secretary's ruling that Diamond Ring had violated the Department regulations prohibiting unauthorized spraying. The court condemned the Secretary's decision to deny the Ranch Company a grazing license for a period of two years, holding that this revocation of the lease or license of the Taylor Grazing Act was not even a legal remedy under the Act.

The license or lease to graze cattle was granted to Diamond Ring in 1966. The ranch is located in the so-called Lander Grazing District in Wyoming. In subsequent years applications were filed by Diamond Ring for the yearly issuance of a license to continue the use of the lands in the so-called Horse Heaven Pasture. In its application submitted in January 1971, Diamond Ring agreed to obey all of the laws and regulations governing the federal range and to pay for all damages sustained by the United States for any violation.

The entire Horse Heaven Pasture has an area of 20,000 acres, 16,000 of which is federal land. The remainder is state and privately owned. This pasture is utilized for livestock grazing and is opened for hunting and fishing, there being draws and streams which flow into the Pathfinder Reservoir which is operated by the Bureau of Reclamation. Diamond Ring has what is called a Section 3 license for the acreage in question. In addition, it has a permit to graze livestock on the state land and is the owner of some private land within the Pasture.

This problem developed following the application by Diamond Ring filed April 12, 1971, seeking from the Agriculture and Sta-

bilization and Conservation Service (ASCS), a subsidy for the spraying of approximately 5,000 acres of ranch company lands with herbicide 2, 4–D, designed to kill sagebrush. This herbicide defoliates plants.

The ASCS compensates a private company for spraying its own land at the rate of $.50 per acre. This subsidy is permitted only on private land and only if the company certifies that 80 percent of the sagebrush sprayed has been defoliated. The application was approved on April 22, 1971, upon the basis of Diamond Ring's representation that all of the land to be sprayed was private land. Unquestionably the government lands were sprayed.

The crucial evidence relied on by the Bureau of Land Management to prove that spraying on the government land was willful was to the effect that Diamond Ring failed to supervise and instruct the pilot of the airplane owned by Buffalo Flying Service as to the land to be sprayed. Prior to the actual spraying the pilot, Doyle Vaughn, and the vice-president of the Ranch Company, Lee Irvine, surveyed the area to be sprayed with the use of three maps and by flying over it in a two-seater tandem airplane. In the course of the flight Mr. Irvine did not identify the privately owned land within the Horse Heaven Pasture nor advise Vaughn how to find the ranch's land nor did he suggest that the Company's privately owned land be flagged or identified to be sure that it alone would be sprayed. Instead he identified the federal land as an area to be sprayed, although not as such. It was the areas of intense sagebrush which were selected. The spraying was conducted on June 15, and on that occasion Mr. Vaughn requested that Irvine accompany him on the flight so as to assist in identifying the areas to be sprayed, but Irvine refused to do this due to being preoccupied at the time with docking sheep.

Vaughn proceeded to spray the land which Irvine had identified on the earlier flight. The area sprayed was within the Horse Heaven Pasture and included 300 acres of Ranch Company land (private), 370 acres of state land and 3,600 acres of

government land which was used by Diamond Ring under a Taylor Grazing Act license.

When the spraying was completed, Irvine applied for the payment of the subsidy payable for spraying 5,000 acres of Ranch Company private land. Thereupon, the $2,500 payment was made. Soon thereafter, on July 28, 1971, the Natural Resource Area Manager of the Bureau of Land Management, Boyce Coffey, whose responsibility was resource management, noticed the discolored area in Horse Heaven Pasture. On examining the ground a short time later he found that considerable areas of federally licensed land had been sprayed. Samples of vegetation, branches, dirt, etc., were gathered and a survey was subsequently undertaken to determine the amount of federally owned land that had been sprayed.

Diamond Ring does not dispute the number of acres of public land sprayed nor does it dispute its failure to obtain prior permission. On November 2, 1971, a violation and hearing notice was sent to Diamond Ring. This alleged that there had been a willful violation of the regulation, 43 C.F.R. Secs. 4112.3–1(e) and 4113.1.

A very considerable hearing which was held generated a voluminous record. The strong reaction of the government officials arose from the fact that there had been a failure to obtain the prior permission of the Bureau of Land Management and from the further fact that the spraying program had been conducted without regard to whether the government land was being sprayed or privately owned land. There does not appear to be much indication that the particular spraying was seriously detrimental to the public land. Indeed, Diamond Ring argues that it helped it by encouraging the production of forage utilized by domestic and game animals and improving the watershed conditions. Whether it helped or hurt is problematical and is of limited relevancy.

After hearing all of the evidence the Examiner found that there was such a lack of preparation for and control over the spraying program as to exhibit a flagrant disregard of property lines and that this was tantamount to an intentional and willful act of spraying the public lands involved. The Examiner concluded that the spraying was willful. This was in accordance with the charge that there had been a willful violation of 43 C.F.R. Sec. 4112.3–1(e).

The Interior Department sought a three-year suspension of the ranch's grazing license for Horse Heaven Pasture lands and a 25 percent reduction on other licensed lands. However, the Hearing Examiner refused to adopt this recommendation and imposed a suspension of the suspension and thus in effect placed the Ranch Company on probation. An administrative appeal was taken to the Interior Board of Land Appeals. This body affirmed the conclusion of willfulness, but modified the Examiner's decision of suspension of the suspension. It ordered an actual imposition of a two-year suspension of the ranch's license covering only the lands sprayed.

On appeal to the district court, Judge Kerr found the ranch error was innocent and in good faith and that the two-year suspension was arbitrary. He further held that the maximum sanction allowed by law was $500, so essentially we must determine whether the district court exceeded the scope of review pursuant to the substantial evidence standard, but basically the question is who has the power to manage these public lands. If the government agency which has granted the lease lacks power to revoke it there is no effective sanction in the law.

No such lack of power in the Secretary is disclosed. The Act demands that he make provision for the protection, administration, regulation and improvement of such grazing districts created under the authority of the Taylor Grazing Act and to make rules and regulations and establish such service, and enter into agreements and do anything necessary to assure the objects of the grazing district, namely, to regulate their occupancy and use, and to preserve the land and its resources from destruction or unnecessary injury. 43 U.S.C. Sec. 315a. The Act

also provides for a $500 fine for any violation. Section 315a, *supra.*

Diamond Ring contends that this is the sole sanction that the Secretary can exercise against a permittee. We reject this interpretation for reasons given below. The structure of the Act and its legislative history support the government's position that the fine was aimed not at licensees, but rather against trespassers. The Department's position is that the government has inherent power to suspend or revoke the license which is granted, but that additional sanctions are needed to protect the land against non-licensee trespassers. It is pointed out that a $500 fine would in effect be a mockery. An operation such as Diamond Ring Ranch, involving as the trial court found hundreds of thousands of acres of land, would have little concern about a $500 fine.

The points raised on appeal are:

1. Whether the Secretary lacked authority under the Taylor Grazing Act to revoke or suspend a grazing license based on the violation of the Secretary's regulations; Appellants further challenge that the sole sanction authorized by law is a fine in the maximum amount of $500, this being the ruling of the district court.

2. The alleged error of the district court in vacating and setting aside the finding of the Hearing Examiner affirmed by the Interior Board of Land Appeals that Diamond Ring Ranch's acts were attended by willfulness in accordance with 43 U.S.C. Sec. 315a and the implementing regulations, 43 C.F.R. 9239.3–2(e).

3. The alleged error of the district court's ruling that the two-year license suspension imposed by the Secretary was unlawful, was arbitrary and constituted an abuse of discretion. Subsidiary to this is the question whether, given the existence of a willful violation, to what extent is the Secretary's choice of penalty subject to being set aside by the district court.

## I.

## DOES THE TAYLOR GRAZING ACT GIVE THE SECRETARY OF THE INTERIOR POWER TO SUSPEND OR REVOKE A GRAZING LICENSE FOR VIOLATION OF REGULATIONS PROMULGATED UNDER THAT ACT?

█ The district court's holding that the Secretary was powerless to suspend or revoke a license as a sanction for violation of the Secretary's regulations and that the Secretary is limited to imposition of a monetary fine of $500 or less gives rise to the important issue in this case, for the view of the district court that Section 2 of the Act excludes the power to revoke grazing licenses would seriously undermine the entire body of law with respect to management of public lands.

First, Section 2 of the Act, 43 U.S.C. Sec. 315a, gives the Secretary of the Interior broad power to administer those public lands included within the "grazing districts" the Act authorizes him to establish.[1] The section says that the Secretary

> shall make provision for the protection, administration, regulation, and improvement of such grazing districts * * * and he shall make such rules and regulations and establish such service, enter into such cooperative agreements, and do any and all things necessary to accomplish the purposes of this chapter and to insure the objects of such grazing districts, namely, to regulate their occupancy and use, to preserve the land and its resources from destruction or unnecessary injury, to provide for the orderly use, improvement, and development of the range * * *

The Act goes on to say that

> any willful violation of the provisions of this chapter or of such rules and regulations thereunder after actual notice thereof shall be punishable by a fine of not more than $500.

---

1. *See Hatahley v. United States*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956) (Secretary's broad regulatory authority under the Act); *see* *also Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 83 S.Ct. 379, 9 L.Ed.2d 350 (1963) (Secretary's plenary authority over public lands).

Superficial reading of Section 2, *supra*, might well give the impression that the Act confers on the Secretary great regulatory authority and responsibility but little enforcement power. Such a conclusion is an absurdity since a ranch of the magnitude of the Diamond Ring could pay the $500 fine frequently as part of the cost of its operations—a cost of doing business, like parking tickets on delivery trucks. If such a view were adopted, the Secretary would lose virtually all regulatory control. We do not suggest that we would ignore the legislative will if we were convinced that such an "absurdity" had emerged from the give and take of the legislative process in the way strong language is sometimes undercut by subsequent limitation.[2]

Second, careful review of the legislative history of the Taylor Grazing Act dispels this possibility. The Act originated in the House of Representatives under the sponsorship of Congressman Taylor of Colorado. Upon passage in the House, the bill went to the Senate Committee on Public Works and Surveys and was reported to the Senate, S.Rep.No.1182, 73rd Cong., 2d Sess., with the following language in Section 2:

> Any willful violation of the provision of this act or of such rules and regulations thereunder after actual notice thereof *shall be punishable by a fine of not more than $500 or by imprisonment for not more than one year.* 78 Cong.Rec. 11141 (1934). (Emphasis added.)

This language allows no doubt that the penalty spoken of was a criminal sanction, and that the limitation referred to the maximum penalty that could be imposed by a court.

In the course of the Senate debate, Senator Borah of Idaho expressed "a fundamental horror of making the citizen liable to fine and imprisonment for violating a regulation." 78 Cong.Rec. 11141. To accommodate him, and presumably others of similar feeling, Senator Adams of Colorado, the bill's manager, agreed to accept an amendment that limited the available criminal penalty to a $500 fine. 78 Cong.Rec. 11141, 11147. The Senate voted to adopt the amendment, 78 Cong.Rec. 11147, and the penalty limitation was accepted by the House as part of the final enactment. Relevant for our purposes is the realization that the $500 fine limitation was intended to refer only to that penalty which could be imposed upon a criminal prosecution for violation of the Act or its implementing regulations. In no way was it intended to limit the administrative sanctions otherwise available to the Secretary.

The power of the Secretary to take such administrative action as a license suspension or revocation was recognized throughout the Senate debate on the Act. The criminal sanction was added to the bill so as to deal with the problem of a trespasser who was not a licensee. It was understood and accepted that the Act gave the Secretary power to suspend or revoke a license. The following colloquy illustrates these points:

> Mr. ADAMS. But does not the Senator recognize that there must be some means of enforcing the rules and regulations?

> Mr. BORAH. Yes; there must be a means of enforcing rules and regulations, like canceling the permit, or anything else we want to do; but here we are making the violation of rules and regulations a penal offense. The Secretary of the Interior has ample authority, if he finds that the party is guilty, to protect himself, because he has complete control of the situation in the granting of the license or anything else.

> Mr. ADAMS. Let me suggest this case: Suppose I am the owner of a herd. I have no permit, and I proceed to drive my herd in upon the grazing district. I have no permit to be canceled; and if I am free from penalty, what is to prevent me really from trespassing to my own

---

**2.** *See, e. g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16–18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971) (discussing supposed limitation in Civil Rights Act of 1964 on district court power to order pupil assignment).

advantage and the detriment of those holding permits and paying for them?

Mr. BORAH. I may be in error as to the matter, but if I understand the bill, the man without a permit or a license would not be there. He is not permitted to go on this land and graze without a permit or license.

Mr. ADAMS. How are we to keep him off if there is no penalty? We have wrestled with some of those problems, I will say to the Senator from Idaho, and I am frank to say that the result has been somewhat unsatisfactory. We have worked out no very adequate solution. 78 Cong.Rec. 11141.

Throughout the years since passage of the Act the Secretary has consistently interpreted it as including the authority to suspend or revoke a grazing license for violation of the regulations. In 1938 the regulations promulgated under the Act, known as the Federal Range Code for Grazing Districts, contained a provision expressly providing that "both licenses and permits will be revocable for violation of the terms thereof," 43 C.F.R. Sec. 501.1(c) (1940 ed.). This provision finds its modern form in 43 C.F.R. Secs. 4113.1, 9239.3–2 (1972), which makes it more explicit that violation of a regulation is a violation of a term of the license.

In 1965 a licensee challenged a suspension of his license on the same ground as the appellee Ranch here, that is, that the penalties available to the Secretary are limited to fines of not more than $500. *Morrel and Sons*, 72 I.D. 100 (1965). In response, the Interior Department reviewed its authority to suspend or revoke a license and concluded that it had such authority:

> * * * [T]he Department has ever since the enactment of the Taylor Grazing Act exercised disciplinary control over its licensees for violations of the terms of their licenses or permits. See *J. Leonard Neal*, 66 I.D. 215 (1959); *Eugene Miller*, 67 I.D. 116 (1960); *Clarence S. Miller*, 67 I.D. 145 (1960); *Alvie E. Holyoak*, A–29805 (January 23, 1964); *L. W. Roberts*, A–29860 (April 23, 1964).

In no other way can the Department fulfill its obligation to protect the Federal range and to provide for the orderly use and management of that range. This disciplinary control is entirely apart from the imposition of a fine as punishment for willful violation of the provisions of the act or the rules and regulations prescribed by the Secretary. Were it otherwise, the Secretary would be completely at the mercy of licensees who could violate the terms of their licenses or permits at their pleasure secure in the knowledge that their only punishment would be the imposition of a fine. 72 I.D. at 109.

Third, Congress on a number of occasions has amended the Taylor Grazing Act (in 1947, 61 Stat. 790; in 1948, 62 Stat. 533; in 1954, 68 Stat. 151) and presumably has been aware of the Secretary's interpretation, but has in no way disturbed the Secretary's power to revoke or suspend a license. In 1964 Congress passed the Classification and Multiple Use Act, 43 U.S.C. Sec. 1411 *et seq.*, which sought to refine and develop existing legislation and to plan for better management of the public lands. The Act was specific in expressing its intention to be "consistent with and supplemental to the Taylor Grazing Act." 43 U.S.C. Sec. 1411. *See also* 43 U.S.C. Sec. 1416. Its legislative history reflects strong approval of public lands management provided in the Taylor Grazing Act. 1964 U.S.Code Cong.Admin. News pp. 3755, 3756 (S.Rep.No.1506, 88th Cong., 2d Sess.). Therefore, it is reasonable to regard this congressional activity as approving the regulatory scheme the Secretary has established, and as suggesting agreement with the Secretary's assertion of the power to revoke or suspend a license for violation of a regulation. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1968); *Zemel v. Rusk*, 381 U.S. 1, 11–12, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Udall v. Tallman*, 380 U.S. 1, 16 (1965); *McLaren v. Fleischer*, 256 U.S. 477, 481, 41 S.Ct. 577, 65 L.Ed. 1052 (1921).

The courts considering the existence of power to suspend in other contexts have

recognized that it does repose in the Secretary. We have treated this as a question of first impression only because it has not been heretofore decided in the context of an actual revocation such as is present here. Nevertheless, every court that has taken up the problem has assumed that the Secretary had power to revoke licenses. True, these pronouncements have arisen in the context of condemnation proceedings where the question has been whether the enhancement of the value of privately owned land brought about by grazing licenses ought to be considered in fixing just compensation. *See, e. g., United States v. Fuller*, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973); *United States v. Cox*, 190 F.2d 293 (10th Cir.), *cert. denied*, 342 U.S. 867, 72 S.Ct. 107, 96 L.Ed. 652 (1951); *United States v. Jaramillo*, 190 F.2d 300 (10th Cir. 1951). Thus, in holding that the licensee under the Taylor Grazing Act does not enjoy any interest in the land but merely a revocable license, the holdings are persuasive in the case at bar. Indeed, the Supreme Court of the United States in *United States v. Fuller, supra*, recognized the proposition that the Secretary of the Interior acting under the Taylor Grazing Act has authority to issue permits and to revoke them. The Court also said that the license does not create any right, title, interest or estate in the lands.[3]

Having concluded that the Taylor Grazing Act confers upon the Secretary the authority at issue in this case, we deem it unnecessary to discuss the further argument of the government and also by the National Wildlife Federation, able amicus curiae, that the National Environmental Policy Act, 42 U.S.C. Sec. 4321 *et seq.*, constitutes an independent source of power to impose sanctions on licensees violating the Secretary's regulations.

## II.

### DID THE DISTRICT COURT ERR IN CONDEMNING THE FINDING OF THE HEARING EXAMINER AND THAT OF THE INTERIOR BOARD OF LAND APPEALS THAT THE ACTION OF THE DIAMOND RING RANCH WAS ATTENDED BY WILLFULNESS AS THAT TERM IS USED IN SECTION 2 OF THE ACT, 43 U.S.C. SECTION 315a AND THE IMPLEMENTING REGULATIONS?

It is fundamental that actions of the agencies are not to be set aside by a reviewing court whether it be the district court under a statutory or a non-statutory review or the court of appeals pursuant to the specific statutes if the action is supported by substantial evidence.[4] Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion. *See Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). It has also been held that there must be that quantum of evidence which would justify refusal by a court to direct a verdict. *Consolo v. Federal Maritime Commission, supra*, at 620, 86 S.Ct. 1018. Even though the facts are sus-

---

**3.** The language of the Court in this regard is as follows:

> The Taylor Grazing Act authorizes the Secretary of the Interior to issue permits to livestock owners for grazing their stock on Federal Government lands. These permits are revocable by the Government. The Act provides, moreover, that its provisions "shall not create any right, title, interest, or estate in or to the lands."

409 U.S. at 489, 93 S.Ct. at 802.

**4.** *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 618–22, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Illinois Central Railroad Co. v. Norfolk*

*& Western Railway Co.*, 385 U.S. 57, 66, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); *Udall v. Snyder*, 405 F.2d 1179 (10th Cir. 1968); *Capitol Packing Company v. United States*, 350 F.2d 67 (10th Cir. 1965).

The Administrative Procedure Act, Section 10(e), provides:
> The reviewing court shall—
>  (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>  (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute   .   .

5 U.S.C. Sec. 706(2)(E).

ceptible to more than one interpretation there can be substantial evidence and the reviewing court is not to substitute its interpretation or selection of evidence for that of the agency. *See Consolo v. Federal Maritime Commission, supra. Cf. Hyatt v. United States*, 276 F.2d 308, 312 (10th Cir. 1960). Moreover, it is not appropriate for the reviewing court to select those parts of the record which it prefers in order to support an independent review because the review must be on the record as a whole. *See* 5 U.S.C. Sec. 706. All of the above emphasizes that the reviewing court's function is limited. It does not and cannot conduct a retrial.

At bar the Hearing Examiner and the Interior Board of Land Appeals both found that the Diamond Ring Ranch's violation was willful within the meaning of Section 2 of the Act. The Ranch, however, argues that it did not have notice that a prerequisite for spraying government land was getting permission. The fact that it did not have knowledge of the statute and of the regulation, 43 C.F.R. Sec. 4112.3–1(e), is no excuse because knowledge of the law is presumed, and particularly here where the license itself provided that the lessee must observe all federal, state and local laws and regulations relating to the conservation or protection of game and other birds and animals and that the lessee shall not remove any vegetative resource except as authorized by the lease or by permit.

Also, publication of the regulations in the Federal Register is constructive notice of their contents. The only relevance of evidence of ignorance by the Ranch is that it might possibly affect the imposition of a sanction.

It cannot be argued, however, that the finding of willfulness is unsupported. Certainly the Ranch knew the difference between its privately owned property and knew that it was under license from the Federal Government. In the first reconnaissance with the pilot the government land was actually indicated as being proper for spraying. Unquestionably, the independent contractor hired to do the spraying, Doyle Vaughn, was not given proper instructions.[5]

From a reading of the testimony which is summarized above, it is plain that the failure on the part of the Ranch employees in this regard was not merely negligence, it was so gross as to be tantamount to willfulness and was sufficient to support a determination of willfulness.[6]

We must reject the citations of criminal definitions because we are here concerned with the civil proceeding and the civil sanction. Thus, neither premeditation nor specific intent to violate the law is essential. Therefore, we must hold that the conclusion of the Hearing Examiner approved or affirmed by the Interior Board of Land Appeals was supported by the required quan-

---

5.  Mr. Vaughn, the independent contractor, testified at the hearing that he was shown the area to be sprayed by Lee Irvine, an officer of the Ranch, through visual observation during a flight (at 500—1000 feet) over the Ranch and through three maps brought on board during the flight.

    Mr. Irvine testified, at the hearing, that during the flight:
    he did not suggest that the private land be flagged during the actual spraying;
    he identified the federal land as an area to be sprayed;
    he instructed Mr. Vaughn to spray where the sagebrush growth was thickest;
    he did not point out the privately owned land in Horse Heaven Pasture;
    although Mr. Vaughn requested him to go along on the spraying flight, which took place several weeks after the first flight, Mr.

Irvine did not go since he was involved in sheep docking operations nor did he suggest that another Ranch employee accompany Mr. Vaughn or that the flight be postponed.

6.  The Supreme Court has defined "willful" in a civil proceeding, *see Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 82 L.Ed. 917 (1937) as "the attitude of [one], who having a free will or choice, either intentionally disregards the statute (or regulation) or is plainly indifferent to its requirements." *United States v. Illinois Central Railroad Co.*, 303 U.S. 239, 243, 58 S.Ct. 533, 535, 82 L.Ed. 773 (1938).

    This Court has defined "willful" in a civil context as ". . . an intentional misdeed or such gross neglect of a known duty as to be the equivalent thereof." *Capitol Packing Company v. United States*, 350 F.2d 67, 78–79 (10th Cir. 1965).

tum of evidence and, therefore, the voiding by the trial court of this finding was unjustified.

### III.

### WHETHER THE TRIAL COURT ERRED IN VACATING THE IMPOSITION BY THE INTERIOR BOARD OF LAND APPEALS OF A SANCTION WHICH ACTUALLY SUSPENDED THE PERMIT OF THE DIAMOND RING RANCH AND DENIED THE LESS EXTREME SANCTIONS PRONOUNCED BY THE HEARING EXAMINER WHICH SUSPENDED THE SUSPENSION CONDITIONAL ON COMPLIANCE WITH THE PERMIT AND THE PROVISIONS OF THE GRAZING ACT

█ The Secretary's position is that the district court was wholly without jurisdiction to review the agency's revocation of the grazing license. Its contention is that the discretion which is vested in the Secretary is so broad that it actually precludes judicial review. See 5 U.S.C. Sec. 701(a)(2). We disagree.[7]

Most agency actions are reviewable under the present law. A good deal of this arises in connection with the substantive statute such as that with which we are dealing. The Taylor Grazing Act, however, does not make specific provision for judicial review (43 U.S.C. Sections 315–315r). In the absence of this we look to Section 10(b) of the Administrative Procedure Act, 5 U.S.C. Sec. 703.[8] Also, the Act of Congress adopted in 1950, 28 U.S.C. Sections 2341, 2352, under-

takes to provide review of orders of a number of agencies and departments exclusively in the court of appeals. There are, in addition, other statutory provisions giving jurisdiction to the courts of appeals which are catalogued in 1 Barron & Holtzoff Section 58. Thus, frequently the review is directly to the court of appeals, but the district court is the appropriate forum for review in cases which are governed by 5 U.S.C. Sec. 703. *In re School Board of Broward County, Florida*, 475 F.2d 1117 (5th Cir. 1973); *Albert v. Chaffee*, 465 F.2d 367 (9th Cir. 1972); *Rettinger v. Federal Trade Commission*, 392 F.2d 454 (2d Cir. 1968); *Sikora v. Brenner*, 126 U.S.App.D.C. 357, 379 F.2d 134 (1967); *see also Pickus v. United States Board of Parole*, 165 U.S.App.D.C. 284, 507 F.2d 1107 (1974).

In the case at bar the plaintiffs invoked jurisdiction under Section 10 of the Administrative Procedure Act, 5 U.S.C. Sections 701–706 and as we view it, this is proper. The Taylor Grazing Act does not fall within the limited class of non-reviewability, *see Sabin v. Butz*, 515 F.2d 1061, 1064–65 (10th Cir. 1975).

█ Next we consider whether the Secretary's modification of the penalty was improper exercise of discretion. The trial court in findings 35 and 36 said:

> The penalty imposed by the Interior Board of Land Appeals is unduly harsh and oppressive, constitutes an abuse of discretion and an arbitrary and capricious act by the Interior Board of Land Appeals not supported by the evidence or by any rational basis.

---

**7.** There is a presumption of reviewability for those agency actions that are alleged to be erroneous. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The exception to reviewability, included in the Administrative Procedure Act, is to be narrowly construed and applied only in a given case where the statute is drafted so broadly that there is no law to apply. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Sabin v. Butz*, 515 F.2d 1061 (10th Cir. 1975); *National Helium Corporation v. Morton*, 455 F.2d 650, 655, fn. 12 (10th Cir. 1971).

**8.** This provision reads as follows:

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

The penalty imposed by the decision of the Interior Board of Land Appeals is disproportionate to any violation charged against Diamond Ring Ranch in the Violation and Hearing Notice, and is arbitrary, capricious and an abuse of discretion.

The reviewing court is empowered to set aside agency action which is arbitrary, capricious or an abuse of discretion under 5 U.S.C. Sec. 706(2)(A) (Sec. 10(e) of the Administrative Procedure Act); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *Glass v. United States*, 506 F.2d 379 (10th Cir. 1974). The reviewing court, however, cannot substitute its own judgment for that of the agency. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). The court's function is to examine the agency action and to determine whether that action has a rational basis or is clearly erroneous. *See Citizens to Preserve Overton Park v. Volpe, supra.* Ordinarily courts defer to the agency's choice of remedies; not so if that choice is arbitrary. *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *United Steelworkers of America v. N. L. R. B.*, 126 U.S.App.D.C. 215, 376 F.2d 770, 773 (1967). The agency action is not immune from being vacated if there has been an abuse of discretion. *See Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Burlington Truck Lines v. United States*, 371 U.S. 156, 172, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 701 (2d Cir. 1975).

At bar we believe that the court was justified in disapproving the modification of the sanction by the review board. The board was concerned for the most part with upholding the power of the Secretary to cancel or suspend the license under the Grazing Act, and in our view it went quite far in imposing the penalty it selected in order to uphold the principle and emphasize its importance. After all, it was not shown that there was any real harm to the land or to the public. The Hearing Examiner considered the recommendation of the Bureau of Land Management that the permit or license be suspended and considered this under the circumstances "to be inordinately disproportionate to the gravity of the violation committed." The Examiner went on to say that "neither the Government nor the public suffered tangible harm from Respondent's act. This is not to say, however, that such unauthorized acts can be condoned or that Respondent should escape scot-free for an intentional violation of the regulations. The public land involved is under the management of the BLM and that agency alone has the authority to decide if, when, where and how sagebrush should be controlled." The Examiner then went on to impose a sanction which denied to the Ranch all grazing privileges in the Horse Heaven Pasture for a period of three years commencing March 1, 1973. He then ordered that there be a suspension of the sanction until such time as a verified showing is made by the BLM that a similar violation has occurred.

In the light of the Examiner's findings of fact and in view of the further consideration that the reports reveal a surprising dearth of prior prosecutions along this line, it is our view that the Hearing Examiner's approach was reasonable and much more in keeping with the underlying facts than was that of the Interior Board of Land Appeals. In our view the cause should be remanded to the district court with directions to that court to enter judgment directing the Secretary to adopt the findings and order of the Hearing Examiner and to vacate that of the Board of Land Appeals.

Accordingly, the judgment of the district court is reversed in part, affirmed in part and remanded for further proceedings consistent with the views expressed herein.